UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEITH LONGUSKI,

    Plaintiff,

vs.                                                                    Case No. 11-11595

IRON WORKERS' LOCAL NO. 25                      HON. AVERN COHN
PENSION PLAN, and BOARD OF
TRUSTEES OF THE IRON WORKERS
LOCAL 25 PENSION FUND,

    Defendants.
_____/

## MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (Doc. 11)

### I. Introduction

This is a benefits case under the Employment Retirement Income Security Act, 29 U.S.C. § 1001, et seq (ERISA).[1] Plaintiff Keith Longuski is suing defendants Iron Workers' Local No. 25 Pension Plan and the Board of Trustees of the Iron Workers

---

[1] The complaint is in two counts. Count I seeks declaratory relief. Although not clear, inasmuch as plaintiff cites § 1132(a)(2) which is a breach of fiduciary duty claim, it may be that plaintiff intended to assert a claim for equitable relief under § 1132(a)(3), ERISA's "catchall provision." Varity Corporation v. Howe, 516 U.S. 489, 512 (1996). However, subsection 1132(a)(3) applies only to beneficiaries who have no other remedy under § 1132. Wilkins v. Baptist Healthcare Sys., 150 F.3d 609, 615 (6th Cir. 1998) (discussing Varity, supra, 516 U.S. at 516). Because § 1132(a)(1)(B) "specifically provides a remedy for breaches of fiduciary duty with respect to the interpretation of plan documents and the payment of claims," and that section allows plaintiffs to seek all necessary relief, including wrongfully denied benefits and future clarification of rights, plaintiff cannot seek duplicative relief under § 1132(a)(3). Varity, supra, 516 U.S. at 512. Indeed, count II of the complaint asserts a claim under § 1132(a)(1)(B), which provides that "a civil action may be brought by a participant or beneficiary to recover benefits due him under the terms of his plan, to enforce his rights under the plan, or to clarify his rights to future benefits under the terms of the plan." Id. Thus the Court construes the complaint as asserting a single claim for benefits under § 1132(a)(1)(B).

Local 25 Pension Plan (collectively, "the Plan") claiming that his disability pension benefit was wrongfully terminated. As will be explained, the Plan paid plaintiff a disability pension benefit from September 1998 (retroactive) until February 2010, when the Plan determined that plaintiff was not eligible for a disability pension benefit from the beginning of payment. Plaintiff has now sued the Plan. The Plan filed a counterclaim seeking to recoup the benefits paid to plaintiff. The matter is before the Court on plaintiff's motion for judgment on the administrative record. For the reasons that follow, plaintiff's motion will be denied and judgment will enter in favor of the Plan.

## II. Legal Standard - Motion for Entry of Judgment

In <u>Wilkins v. Baptist Healthcare System, Inc.</u>, 150 F.3d 609 (6th Cir.1998), the Court of Appeals for the Sixth Circuit held that summary judgment procedures are not appropriate in the Sixth Circuit in denial of benefits actions under ERISA. Rather, a district court should adjudicate an ERISA action as if it were conducting a standard bench trial and, therefore, determining whether there is a genuine issue of fact for trial would make little sense. <u>Wilkins</u>, 150 F.3d at 618-19 (Gilman, J., concurring in part and setting out the judgment of the court of appeals on the issue regarding the summary judgment standard).

Accordingly, the Court will decide this matter under the guidelines set forth in <u>Wilkins</u>[2] by rendering findings of fact and conclusions of law based solely upon the

---

[2] The court of appeals' "Suggested Guidelines" are as follows:
1. As to the merits of the action, the district court should conduct a <u>de novo</u> review based solely upon the administrative record, and render findings of fact and conclusions of law accordingly. The district court may consider the parties' arguments concerning the proper analysis of the evidentiary materials contained in the administrative record, but may not admit or consider any evidence not presented to the administrator.

2

administrative record.³ See Eriksen v. Metropolitan Life Ins. Co., 39 F. Supp. 2d 864 (E.D. Mich. 1999).

### III. Standard of Review

The parties agree that the standard of review in this case is whether the denial of benefits was arbitrary and capricious because the Plan had discretionary authority to construe and interpret its provisions.⁴ See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 983 (6th Cir.

---

2. The district court may consider evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part. This also means that any prehearing discovery at the district court level should be limited to such procedural challenges.
3. . . . the summary judgment procedures set forth in Rule 56 are inapposite to ERISA actions and thus should not be utilized in their disposition.
150 F.3d at 619.

³The administrative record was filed with the Court. Doc. 9. Citations to the administrative record are "AR," followed by the corresponding numbered page. For example, page 75 of the administrative record is cited as AR 75.

⁴The Plan, found at AR 95-168, is entitled "Amendment and Restatement of Iron Workers Local No. 25 Pension Plan," dated June 1, 1996. Article VII, entitled "Administration," states in part under Section 7.2, "Powers of Trustees:"
    The Trustees shall have such powers as are necessary for the proper administration of the Plan as set forth in the above Trust Agreement, and including, but not by way of limitation, the following:
        (a)    To prescribe procedures to be followed by Participants in filing application for benefits and for the furnishing of evidence necessary to establish Participants' rights to benefits under the Plan.
        (b)    To make determinations a to the rights under the Plan of any Participant applying for or receiving benefits and to afford any such individual dissatisfied with any such determination the right to a hearing thereon;

3

1991). This standard is the "least demanding form of judicial review." <u>Administrative Committee of the Sea Ray Employees Stock Ownership and Profit Sharing Plan v. Robinson</u>, 164 F.3d 981, 989 (6th Cir. 1999). This requires "review of the quality and quantity of the medical evidence and the opinions on both sides of the issues." <u>McDonald v. W.-S. Life Ins. Co.</u>, 347 F.3d 161, 172 (6th Cir.2003). The plan administrator's decision should be upheld if it is "the result of a deliberate, principled reasoning process" and "supported by substantial evidence." <u>Glenn v. MetLife</u>, 461 F.3d 660, 666 (6th Cir. 2006), <u>aff'd</u>, <u>Met. Life Ins. Co. v. Glenn</u>, --- U.S. ----, 128 S.Ct. 2343 (2008). The standard, although deferential, is not "inconsequential." <u>Moon v. Unum Provident Corp.</u>, 405 F.3d 373, 379 (6th Cir. 2005). "While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." <u>Id</u>.

Moreover, the Sixth Circuit has made clear that a court is to consider several factors in reviewing a plan administrator's decision, including the existence of a conflict of interest, the plan administrator's consideration of a Social Security Administration determination, and the quality and quantity of medical evidence and opinions. <u>Glenn</u>, 461 F.3d at 666. Here, because the same entity funds and administers the Plan, this conflict of interest will be taken account in determining whether the Plan acted arbitrarily or capriciously.

### IV. Findings of Fact

The following facts are gleaned from the administrative record.

### A. Relevant Plan Provisions

Section 4.5(a) of the Plan requires that "active participants" are eligible for

4

pension disability benefits, stating in relevant part:

> Eligibility.  Any Active Participant who has earned seven (7) or more Years of Service and who is totally and permanently disabled, as described herein, prior to attaining his Normal Retirement Age, shall be eligible for a disability benefit on the first stay of the month following his submission of an application therefor. Total and permanent disability means a disability which the Trustees find on the basis of competent medical evidence . . .

(AR 123).

Section 1.36(a) defines an "Active Participant" as "a Participant who has not yet become retired, deceased or a former Participant and who has not suffered three (3) consecutive one year breaks in service."

(AR 110).

Section 3.6(a), defines a break on service, providing in pertinent part:

> A Break in Service shall have occurred if in any Plan Year a Participant has less than eight hundred seventy (870) Hours of Service.  **No break in service shall occur during any period of disability**, or after the Participant has become eligible for Early or Normal Retirement.

(AR 120) (emphasis added).

Section 4.5(a) also defines disability benefits, stating that

> "Total and permanent disability means a disability which the Trustees find on the basis of competent medical evidence and: (I) is the result of any medically demonstrable physical condition; (ii) prevents a Participant from engaging in work covered by the Collective Bargaining Agreement; and (iii) will presumably be permanent or is expected to be of prolonged and indefinite duration."

(AR 124).

According to plaintiff, Section 4.5(c) is also relevant.  This section states  when disability benefits may be terminated, stating:

> (I) the Trustees determine on the basis of competent medical evidence that the disabled Participant has sufficiently recovered to resume employment covered by the Collective Bargaining Agreement;
> (ii) the disabled Participant refuses to undergo a medical examination requested

> by the Trustees, provided that he may not be required to undergo a medical examination more often than semi-annually; or
> (iii) any participant who becomes disabled as described in Section 4.5(a) hereof, may become re-employed on a trial basis in the iron working industry for a period of sixty (60) calendar days without forfeiting his disability benefit. This temporary re-employment clause is provided to allow a participant the opportunity to determine if in fact he is capable of returning to work on a full-time basis in the iron working industry. This temporary re-employment provision is available on a one time only basis.

(AR 124).

### B. Plaintiff's Claim for Disability Pension Benefits

Plaintiff worked as a union iron worker from 1979 until 1992. (AR 6). Plaintiff is a participant in the Iron Workers Local No. 25 Pension Plan, governed by ERISA. (AR 95-168). The Board of Trustees of the Iron Workers Local No. 25 Pension Fund is both the plan sponsor and plan administrator. (AR 139).

Plaintiff suffered multiple back injuries throughout his fourteen years of employment as a union iron worker. (AR 9-12, 19). In 1993, plaintiff stopped working, allegedly due to his injuries.

On November 8, 1999, approximately seven years after he stopped working as an iron worker, plaintiff applied for disability pension benefits under the Plan. (AR 5). As part of his application, plaintiff authorized Defendants to "obtain from [his] physician whatever information they deem necessary to investigate or substantiate my claim for disability[.]" Id.

As part of his application, the Plan received a Medical Examiner's Report from plaintiff's physician, Dr. John Koch, dated October 28, 1999. (AR 5, 19). Dr. Koch described the nature of plaintiff's disability as "low back pain due to multifactorial etiologies including facet arthropothy, sacrociliac dysfunction and degenerative

6

changes." Dr. Koch reported that the disability commenced "on or about 1979 thru 1993," which was during the time plaintiff was working as a union iron worker.

The standard physician's report supplied by the Plan stated: "Under the Pension Plan, 'Permanent Disability' means in part to be 'totally and permanently prevented from performing work normally performed by an ironworker'. [sic]" Dr. Koch struck out the language on the report which stated "I am of the opinion this applicant is Permanently Disabled." Instead, Dr. Koch wrote the following: "I recommend that Keith Longuski not return to iron work due to potential risk of exacerbation to his low back pain and also for patient safety reasons due to his increased fall risk from decreased back pain."

On November 8, 1999, the Plan informed plaintiff that he would be examined "by the Fund Doctor," Dr. Howard J. Sawyer M.D. (AR 13). Plaintiff provided Dr. Sawyer with all the requested medical records from his personal physician for review. (AR 13).

On November 17, 1999, Dr. Sawyer gave the Plan a report. (AR 9-12). Dr. Sawyer reported that "[b]ecause of chronic low back pain, [Longuski stopped doing iron work approximately six years ago." (AR 9). Dr. Sawyer reported that "[f]rom my lengthy interview, it is obvious that Mr. Longuski's pathology is related to muscles and connective tissue (ligaments and tendons). The examination reveals that all eighteen tender points characteristic of fibromylgia syndrome were present." Dr. Sawyer also reported Longuski's work and injury history, stating that "Mr. Longuski is a thirty-eight year-old man who has been an iron worker since age seventeen[.]" (AR 9). Dr. Sawyer then set forth a chronology of work-related injuries. Under a section entitled "The Decision to Leave Iron Work," Dr. Sawyer relayed Longuski's reason for ceasing iron work as follows:

7

> In 1993, Mr. Longuski worked two weeks at the Ford truck plant. During which he experienced severe back pain.  At the end of the workshift, he related, he could not even stand properly.  Nevertheless, he continues to pay dues and considers himself an iron worker, hoping to return to work.
> One day, while bending over to wash a paint brush, he could not stand up . In fact, the pain was so severe that he had to walk on his hands and knees into the house.  On this occasion, he decided that his days as an iron worker had ended.
> Mr. Longuski is now working as a salesman for Don Massey Cadillac, car sales having previously been an interim job for him during periods of unemployment.

(AR 10).

Under the discussion section, Dr. Sawyer reported that "[i]t now seems probable that, during his entire working career, Mr. Longuski has suffered from fibromylgia syndrome.  This sometimes-misunderstood diagnosis is often severely disabling." Id.  In the conclusion section, Dr. Sawyer stated:  "Considering the severity and duration of Mr. Longuski's FMS, I consider him permanently unable to safely and reliably perform unrestricted iron work."  (AR 12)

On December 10, 1999, the Plan approved plaintiff's application for disability pension benefits, retroactive to September 1998.[5]  (AR 14)

The Plan paid plaintiff's disability pension benefits from September 1998 until February 2010. (AR 7).

On February 8, 2010, plaintiff contacted the Plan office to inquire as to when his

---

[5]The Plan paid plaintiff a lump sum of $11,135.00, noting in a letter dated December 10, 1999, that subsequent disability pension checks would be $710.00 per month.  (AR 14).  However, five days later, on December 15, 1999, the Plan sent plaintiff a letter indicating that it miscalculated his initial benefit award by $665.00 and that the overpayment would be offset in his monthly January 2000 benefit.  (AR 21) Apparently the mis-calculation was due the Plan determining that plaintiff's monthly benefit was $685.00 from September 1998 to May 1999 and $710.00 per month from June 1999 thereafter.

8

disability pension benefit would convert to a normal pension benefit. This inquiry resulted in the Plan examining plaintiff's claim.

On March 29, 2010, the Plan notified plaintiff of the decision to terminate his disability pension benefits. (AR169-170). The termination letter states:

> Dear Mr. Longuski:
>
> On February 8, 2010, you contacted the Plan office to inquire as to when your disability pension benefit would convert to a normal pension benefit.
>
> Upon reviewing your request, it was determined that you have been receiving disability benefits in error. At the time you commenced disability benefits, on September 1, 1998, you were an Inactive Participant. The language of the Iron Workers' Local No. 25 Pension Plan ("Plan") has consistently stated from September 1, 1998 to the present that an individual must be an Active Participant in order to be eligible for disability benefits. Section 4.5(a) of the Plan provides:
>> <u>Eligibility</u>. Any **Active Participant** who has earned seven (7) or more Years of Service and who is totally and permanently disabled…shall be eligible for a disability benefit on the first day of the month following his submission of an application therefore. (emphasis added).
>
> Section 1.36(a) of the Plan has likewise consistently stated, from the effective date of your disability pension to the present, the following:
>> [An] Active Participant, effective with the Plan Year ended April 30, 1983, is a Participant who has not yet become a retired, deceased or former Participant and who has not suffered three (3) consecutive one year breaks in service…
>
> The Fund's records indicate that you became inactive on May 1, 1995. Therefore, you were erroneously approved for a disability benefit and such benefits have been terminated. Further, you are not yet eligible for early or normal retirement benefits.

(AR 169-170).

Plaintiff filed a timely appeal with the Plan Administrator. (AR 52-55, 34-36).

On August 26, 2010, the Plan denied plaintiff's appeal. The Plan again concluded that because plaintiff had a break in service he was not an active participant in the Plan and therefore was not eligible for a pension disability benefit, citing the same Plan provisions in the original denial letter. As to plaintiff's argument that he did not

9

have a break in service because he was disabled from 1992 to 1995, the Plan stated in its letter:

> You assert that under the language of Section 3.7(a), Mr. Longuski did not have a Break in Service because he was disabled from 1992 to 1995. To support this assertion, you rely on the report provided by Dr Sawyer. Dr. Sawyer concludes that as of the date of the exam in 1999 Mr. Longuski was unable to perform iron work. He did not establish or provide an opinion on when he became unable to perform such work. Dr. Sawyer stated, as you note, that it seems "probable that, during his entire working career, Mr. Longuski has suffered from fibromylgia syndrome." Even if this is true, this condition did not disable Mr. Longuski from working as an iron worker over a 12 year period. The exception to the Break in Service provisions for disability is meant to protect those who cannot earn hours of service because they cannot perform iron work. There is no proof in the records that from 1992 to 1995 Mr. Longuski was disabled to the extent that he was unable to work as an iron worker.

(AR 41).

Plaintiff apparently took another appeal. On November 4, 2010, the Plan issued another notice of decision denying Plaintiff's appeal. (AR 1-3). The Plan upheld the decision terminating plaintiff's benefits on the grounds that he had a break in service prior to his application for disability pension benefits and was therefore not an "active participant" in the Plan in 1999, when he applied for disability pension benefits, and when his application for disability pension benefits was approved by the Plan. Id. 14. As to plaintiff's argument that he was disabled and therefore did not have a break in service, the Plan further explained in its letter:

> You assert again that under the language of Section 37(a), Mr. Longuski did not have a Break in Service because he was disabled as of 1992. To support this assertion, regarding Dr. Sawyer's report you state in your September 24 letter that: "Because of the severity and duration of Mr. Longuski's fibromylgia syndrome and combined back disability [Dr. Sawyer] determined Mr. Longuski to be permanently disabled during his entire working career." First, no such statement appears in Dr. Sawyer's report. Second, the assertion itself does not make sense as had Mr. Longuski been permanently disabled during his entire working career, he would not have been able to work as an iron worker as he did for 12 years. Dr. Sawyer stated that it seems "probable that, during his entire

10

working career, Mr. Longuski has suffered from fibromylgia syndrome." **Having a condition and being disabled as a result of such condition are clearly two different issues**.

(AR 2)(emphasis added).

### C. Plaintiff's Arguments

**1.**

Plaintiff says that the primary issue is whether he was disabled from iron work during the period between his last day of work and his application for disability pension benefits, i.e. from 1992 to 1999. Plaintiff says that all of the medical evidence in the record establishes that plaintiff was permanently disabled from performing iron work and that he suffered a "period of disability" following his last day of iron work and preceding his application for disability retirement benefits. Plaintiff says that all of the medical evidence in the administrative record supports the conclusion that plaintiff suffers from physical conditions which render him incapable of continuing in his usual and customary employment (iron work) with an employer. Plaintiff relies on Dr. Sawyer's and Dr. Koch's reports.

Plaintiff does not accurately state what these doctors opined. As to Dr. Sawyer, as the Plan explained in its denial letters, Dr. Sawyer did not opine that plaintiff was disabled from 1992 to 1999. Dr Sawyer only said that plaintiff could not perform iron work as of his examination in 1999. While Dr. Sawyer also said that plaintiff likely suffered from fibromylgia syndrome for many years, including during his years as an iron worker, he did not opine that plaintiff was disabled from working as an iron worker during those years, or the intervening years from 1992 to 1999. Plaintiff's physician, Dr. Koch, reported that the nature of Longuski's disability was "low back pain due to

11

multifactorial etiologies including facet arthropothy, sacrociliac dysfunction and degenerative changes." (AR 19). While he reported that the disability commenced from "1979-1993," this was during plaintiff's employment as a union iron worker. Significantly, Dr. Kohn, like Dr. Sawyer, concluded that as of 1999, plaintiff could not work as an iron worker. The Plan reasonably interpreted both doctors' reports to find disability as of 1999, not some point in time earlier. Indeed, it would not make sense to find plaintiff disabled from performing iron work during the time he was working as an iron worker. As the Plan pointed out, having a disability and being disabled are not the same. Moreover, the statement in Dr. Sawyer's report relaying plaintiff's decision to stop iron work after being unable to pick up a paint brush contains no time reference. Overall, it is clear that plaintiff was unable to perform iron work in 1999. Unfortunately for plaintiff, that finding came too late because by 1999 plaintiff had already had a break in service.

Plaintiff's argument is based on fragments of the doctors' reports that are dated seven years after he left iron work. The Plan provided a reasoned explanation as to why the record did not support a finding that he was disabled, i.e. unable to perform iron work, from 1992 to 1995. The Plan interpreted the reports from Dr. Kohn and Dr. Sawyer as not establishing that plaintiff was disabled from 1992 to 1995. Therefore, the Plan concluded that plaintiff had a break in service making him ineligible for the pension disability benefit he applied for in 1999. The Court cannot say that the Plan's decision was arbitrary and capricious.

Moreover, while not specifically raised, it is important to note that the Plan had an obligation to correct what it believed to be an error in paying plaintiff a pension disability

12

benefit. The Sixth Circuit has made clear that an ERISA fiduciary has "the power and corresponding duty to act in the interests of the plan's beneficiaries, that is, to take necessary and appropriate action with respect to the required contributions and missing repayments." Best v. Cyrus, 310 F.3d 932, 935 (6th Cir. 2002). In Best, the Sixth Circuit found that the plan fiduciary had "a specific duty to secure ... contributions and repayments because ERISA clearly assumes that trustees will act to ensure that a plan receives all funds to which it is entitled, so that those funds can be used on behalf of participants and beneficiaries." Id. at 936. ERISA requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." See 29 U.S.C. § 1104(a)(1). Fiduciary duties under ERISA also include those imposed under the common law of trusts. Under the law of trusts, a fiduciary is required "to perform the duties imposed, or exercise the powers conferred, by the trust documents." Varity Corp. v. Howe, 516 U.S. 489, 502 (1996). Thus, when the Plan concluded that plaintiff received a benefit it did not believe he was entitled to, it had an had an affirmative obligation to correct it.

**2.**

Plaintiff also argues that the Plan's decision to discontinue benefits was arbitrary and capricious because under the terms of the Plan, Total and Permanent Disability Retirement Benefits shall be terminated if:

> (I) the Trustees determine on the basis of competent medical evidence that the disabled Participant has sufficiently recovered to resume employment covered by the Collective Bargaining Agreement;
> (ii) the disabled Participant refuses to undergo a medical examination requested by the Trustees, provided that he may not be required to undergo a medical examination more often than semi-annually; or
> (iii) any participant who becomes disabled as described in Section 4.5(a) hereof, may become re-employed on a trial basis in the iron working industry for a period

> of sixty (60) calendar days without forfeiting his disability benefit. This temporary re-employment clause is provided to allow a participant the opportunity to determine if in fact he is capable of returning to work on a full-time basis in the iron working industry. This temporary re-employment provision is available on a one time only basis.

Plaintiff says there is no dispute that the Plan did not find that any of these events when they terminated plaintiff's disability pension benefits.  Plaintiff says that no determination was made, on the basis of competent medical evidence or otherwise, that (1) plaintiff had sufficiently recovered to resume employment, (2) a request was made for plaintiff to undergo a medical examination and he refused, or (3) there was opportunity for re-employment was provided to determine whether or not plaintiff could return to iron work.

Plaintiff's position is not-well taken.  While Section 4.5.(c) sets forth conditions when benefits may be terminated, the Plan's decision was based on its determination that plaintiff was not an active participant because he had a break in service from the time he left iron work in 1993 until the time he applied for pension disability pension benefits seven years later.  In other words, plaintiff did not qualify for benefits in the first instance.  As noted above, the Plan had an obligation to revisit plaintiff's eligibility.  Indeed, Section 7.2(b) of the Plan grants the Trustees the authority to "make determinations as to the rights under the Plan of any Participant." (AR 140).  Section 4.5(c) simply does not apply to the Plan's decision.  Under Section 4.5(a) of the Plan, only active participants are entitled to a pension disability benefit.  The Plan determined that plaintiff did not meet that definition because he was not disabled during the time from when he last worked, in 1992, to 1995.  Thus, the Plan concluded plaintiff had a break in service and was not eligible for a disability pension benefit.  The Plan's decision

was a straightforward interpretation of the Plan's provisions and the Court cannot say it was arbitrary or capricious. See Davis v. Kentucky Finance Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir. 1989) (Administrator's decision should be upheld only if it is "rational in light of the plan's provisions.").

## V. Conclusion

For the reasons stated above, the Plan's decision to terminate plaintiff's pension disability benefits was not arbitrary or capricious. The decision was based on Plan provisions which were reasonably interpreted and applied to the facts as the Plan viewed them. Accordingly, plaintiff's motion for judgment is DENIED. A judgment shall enter in favor of the Plan.[6]

SO ORDERED.


Dated: December 9, 2011
           S/Avern Cohn
           AVERN COHN
           UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, December 9, 2011, by electronic and/or ordinary mail.

           S/Julie Owens
           Case Manager, (313) 234-5160

---

[6]As noted above, the Plan filed a counterclaim seeking to recoup the benefits paid to plaintiff. Although the counterclaim does not cite a specific provision of ERISA, presumably it is a claim for equitable relief under § 1132(a)(3). However, the Plan has not moved for judgment on its counterclaim. The only matter before the Court is plaintiff's motion for judgment. Under the circumstances, the counterclaim is DISMISSED WITHOUT PREJUDICE.